Honorable Tiffany M. Cartwright

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| HAROLD C. WILLIAMS, JR., | No. 3:22-cv-06004 TMC |
| Plaintiff, | DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| LEGACY HEALTH, A Public Benefit Corporation, and DOES 1 THROUGH 10, Inclusive, | NOTE ON MOTION CALENDAR: FRIDAY, JUNE 28, 2024 |
| Defendants. | |

| |
|---|
| TOBY HIGA, an Individual, |
| Plaintiff, |
| v. |
| LEGACY HEALTH, an Oregon Public Benefit Corporation; NORTHWEST ACUTE CARE SPECIALISTS, an Oregon Professional Corporation; and DOES 1 through 50, Inclusive, |
| Defendants. |

| |
|---|
| DANIELA MARIANU, ANGELA LOGHRY, and IVAN ATANASSOV, |
| Plaintiffs, |
| v. |

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 1
(CASE #3:22-CV-06004 TMC)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

LEGACY HEALTH, an Oregon Public Benefit
Corporation; and JOHN and JANE DOES 1
through 50, Inclusive,

Defendants.

---

RISA BRODY, AIMEE SWEET,
DAMARIS BRICI and BRIANNA HALL,

Plaintiffs,

v.

LEGACY HEALTH, a Public Benefit
Corporation; and JOHN and JANE DOES 1
through 50, Inclusive,

Defendants.

## I. INTRODUCTION

Defendant Legacy Health ("Legacy") respectfully brings this motion for summary judgment requesting dismissal of all Plaintiffs' claims with prejudice. Plaintiffs are former healthcare workers[1] who worked at Legacy Salmon Creek Medical Center (in Vancouver, Washington) performing patient care and/or interacting with patients and other healthcare workers on a daily basis. In summer 2021, after COVID-19 vaccines had been approved and healthcare systems nationwide were navigating the deadliest wave of the pandemic, Legacy instituted a policy requiring that employees be fully vaccinated against COVID-19 (the "Vaccination Policy"), subject to approved medical or religious exceptions, consistent with the scientific consensus that vaccination was the most effective tool to protect against COVID-19.

Plaintiffs requested religious exceptions from the Vaccination Policy.  Working in positions that could not be performed remotely, Plaintiffs asked to be permitted to continue performing patient care and/or interact directly with patients, families, and other Legacy health

---

[1] Plaintiff Higa still provides contract services for Legacy. *See* discussion *infra* Section II.I.1.

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 2
(CASE #3:22-CV-06004 TMC)

**STOEL RIVES LLP**
**ATTORNEYS**
**600 University Street, Suite 3600, Seattle, WA  98101**
*Telephone 206.624.0900*

1    care workers and staff while unvaccinated.  Legacy denied Plaintiffs' religious exception

2    requests and later terminated their employment (with the exception of Plaintiff Higa who did

3    become fully vaccinated).  Plaintiffs now claim that Legacy discriminated against them because

4    it did not accommodate their religious beliefs by allowing them to remain working on-site,

5    unvaccinated, at a time when COVID-19 was overwhelming Legacy's facilities.  Plaintiffs'

6    theory fails as a matter of law because accommodating Plaintiffs would have been an undue

7    hardship for Legacy.  Accordingly, Legacy and the unidentified "Doe"[2] Defendants are entitled

8    to summary judgment on all of Plaintiffs' claims.

9                               **II.  FACTUAL BACKGROUND**

10   **A.    Legacy**

11            Legacy is a regional, non-profit healthcare system that operates eight hospitals in the

12   Portland, Oregon and Vancouver, Washington metro areas and the mid-Willamette Valley,

13   including a full-service children's hospital, a 24-hour mental and behavioral health hospital, and

14   more than 70 primary care, specialty, and urgent care clinics.  Declaration of Melinda Muller, ¶

15   4.  Legacy has approximately 14,000 employees and nearly 3,000 allied healthcare providers

16   who collectively provide safe, quality care in a variety of settings including hospitals, labs,

17   physicians' offices, outpatient centers, and urgent care clinics.  *Id.*

18   **B.    COVID-19**

19            COVID-19 is a disease caused by the coronavirus SARS-CoV-2, first reported in late

20   2019 in Wuhan, China. *Id.*, Ex. F (hereinafter, "Cohen Rep.") ¶ 15.[3]  By March 2020, the World

---

[2] Plaintiffs named unidentified "Doe" Defendants in all four actions that were consolidated into this case. They specify no discrete claims against the Doe Defendants; Legacy assumes that Plaintiffs allege all the same claims against the Doe Defendants as asserted against Legacy and Northwest Acute Care Specialists.

[3] Dr. Cohen is the Medical Director of Infection Prevention at the University of Washington Medical Center, and a Clinical Associate Professor in the Division of Allergy and Infectious Diseases at the University of Washington. Cohen Rep. ¶ 4. The Cohen Report is attached as Exhibit F to the Doyer Declaration.

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 3
(CASE #3:22-CV-06004 TMC)

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1  Health Organization declared the COVID-19 outbreak a pandemic and the virus had reached

2  Washington, including Legacy's facilities.  *Id.*; Muller Decl. ¶ 5.[4]

3       COVID-19 presented unique challenges to healthcare systems.  First, the virus is easily

4  transmitted.  While a person may become infected with COVID-19 through various modes of

5  transmission, the primary way COVID-19 spreads is person to person via infected respiratory

6  droplets and aerosols.  Cohen Rep. ¶ 20.  An individual infected with COVID-19 emits

7  respiratory secretions containing viral particles, some of which evaporate in the form of aerosols

8  and remain in the air, which may contribute to longer-range transmission.  *Id.*  Further

9  complicating matters, some infected individuals may be asymptomatic.  Cohen Rep. ¶ 21.

10      Second, COVID-19 is associated with several severe clinical outcomes, even among

11  healthy individuals.  Cohen Rep. ¶ 32.  By December 15, 2021, one out of every 100 persons in

12  the United States above the age of 65 had died from COVID-19 and the U.S. death toll was

13  greater than 800,000.  Cohen Rep. ¶ 29.  COVID-19 is especially dangerous for individuals over

14  65 or those with medical comorbidities.  Cohen Rep. ¶ 19.  Such populations are prevalent at

15  Legacy's facilities, Muller Decl. ¶ 28, and when these individuals become infected, they are

16  more likely to require hospitalization, intensive care monitoring, and mechanical ventilation.

17  Cohen Rep. ¶ 19.

18      Third, healthcare providers are at high risk of being infected with COVID-19 because (1)

19  they are frequently unable to socially distance at work, (2) they often work in facilities where

20  there are outbreaks, and (3) they continued to report for duty after the pandemic hit while

21  employees in many other fields were able to work remotely.  Cohen Rep. ¶ 34.  Additionally,

22  many healthcare providers work with vulnerable populations, raising the stakes of their potential

23  transmission of the virus to others.  Cohen Rep. ¶¶ 32-33.

24

25

26  _____

[4] While COVID-19 remains a global threat today, the relevant timeframe for purposes of this motion is 2020 (when the first COVID-19 patients arrived at Legacy's facilities) and 2021 (when the Vaccination Policy was enacted).

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 4
(CASE #3:22-CV-06004 TMC)

**STOEL RIVES** LLP
ATTORNEYS
**600 University Street, Suite 3600, Seattle, WA  98101**
*Telephone 206.624.0900*

**C.    Legacy's Response to the Pandemic**

From the beginning of the pandemic, Legacy's Senior Leadership Team ("SLT"), which included its Senior Vice Presidents and Chief Executive Officer, strived to rely on scientific consensus, agency guidance (including from the Centers for Disease Control and Prevention ("CDC"), and the Washington State Health Care Authority), and the expertise of its own clinical leaders when implementing COVID-19-related policies and procedures.  Muller Decl. ¶ 5.  The SLT's overarching goals were to ensure that Legacy remained able to provide the safest possible environment for patients and providers,[5] while instilling public trust in Legacy's capabilities during a major global event.  *Id.*  However, the obstacles were often significant.  Muller Decl. ¶ 6.  Some patients delayed or declined to seek care, making their health conditions more dire when they finally did obtain treatment at Legacy's facilities.  *Id.*; Cohen Rep. ¶ 33.  Even with many patients avoiding the hospital, Legacy's facilities were continuously at capacity.  Muller Decl. ¶ 6.  At times, elective surgeries and non-emergent and urgent care were suspended so that patient care staff could be redeployed to address an influx of COVID-19 patients.  *Id.* Unsurprisingly, the pandemic had a considerable impact on Legacy's providers, and staff use of sick time was often significantly higher than normal, with hundreds of employees often out sick or on work restrictions at any given time.  Muller Decl. ¶ 7.  These staffing fluctuations exacerbated the strain on Legacy's ability to provide patient care.  *Id.*

Legacy sought to address the challenges by limiting the spread of COVID-19 within its facilities.  Muller Decl. ¶ 8.  Its Infection Prevention and Control team led the efforts to reduce risk on Legacy's premises through the implementation of an Infection Control Plan that was shared with all providers, while carefully tracking and monitoring patient and staff infections.  *Id.*  Safety measures evolved as the pandemic progressed and included requiring the use of Personal Protective Equipment ("PPE"), testing, temperature checks, self-reporting illness or

---

[5] Legacy's uses the term "providers" throughout this briefing to mean employees, contractors, and other health care workers providing services in Legacy's facilities.

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 5
(CASE #3:22-CV-06004 TMC)

1    symptoms, social distancing when possible, and various hygiene protocols including hand

2    hygiene, environmental disinfection, and room air changes.  *Id*.

3          Legacy also kept an open line of communication with its employees and contractors as

4    the COVID-19 crisis evolved.  Muller Decl. ¶ 9.  All Legacy providers meet daily in huddles by

5    "tier" (level) to discuss safety and other current issues.  *Id*.  In addition to the daily huddles,

6    Legacy sends frequent written updates about current events, upcoming changes, and other related

7    information to its workforce, including a weekly all-staff "Front Page" newsletter and a bi-

8    monthly "Leading at Legacy" newsletter for those in leadership roles.  *Id*.  Additionally, in 2020,

9    Legacy began sending a separate weekly update to all providers focusing specifically on the

10    latest COVID-19-related developments.  *Id*.

11          Notwithstanding these efforts, including masking, testing, and social distancing (when

12    possible), COVID-19-related hospitalizations and deaths continued to grow, Muller Decl. ¶ 10.

13    By December 1, 2020, Legacy was treating over 126 COVID-19-positive patients at its facilities

14    on an inpatient basis. *Id*., Ex. 2.  At that time, this was a systemwide high, necessitating Legacy's

15    use of refrigerated semi-truck trailers as temporary, overflow morgues for deceased patients. *Id*.,

16    Ex. 3.

17          Finally, in early December 2020, the first COVID-19 vaccine shipments arrived at

18    Legacy, "bringing with them hope and optimism for a return to normalcy" in Legacy facilities.

19    *Id*., Ex. 4.

20    **D.    COVID-19 Vaccines**

21          The Food and Drug Administration ("FDA") issued an initial Emergency Use

22    Authorization ("EUA") for the Pfizer BioNTech COVID-19 vaccine on December 11, 2020,

23    followed by an EUA for the Moderna and Johnson & Johnson vaccines on December 18, 2020

24    and February 2021, respectively.  Cohen Rep. ¶ 22.  The Pfizer vaccine received full FDA

25    approval in August 2021, and the Moderna vaccine received full FDA approval in January 2022.

26    *Id*.

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 6
(CASE #3:22-CV-06004 TMC)

The vaccines were both safe and effective at both preventing infection and reducing severe illness and death, and their arrival was an important step in reducing the impact of COVID-19 at healthcare facilities.  Cohen Rep. ¶¶ 23, 25, 30-31.  High vaccination rates reduce overall transmission risk, in part because people who are vaccinated are less likely to become infected, which in turn reduces the likelihood that they will infect patients.  Cohen Rep. ¶ 24. For example, one study found that two vaccine doses were significantly associated with a 50% decrease in cases.  *Id*.  COVID-19 vaccination is highly effective in the healthcare setting, with one CDC study involving healthcare personnel showing a vaccine effectiveness of 80% in preventing infection.  Cohen Rep. ¶ 26.  Through the end of June 2021, COVID-19 vaccines had averted an estimated 279,000 deaths and 1.25 million hospitalizations in the United States. Cohen Rep. ¶ 30.

The COVID-19 vaccines were also unparalleled in their ability to protect both healthcare workers and their patients.  Cohen Rep. ¶ 34.  While the safety measures that Legacy took before vaccines arrived (including requiring employees to use PPE, stay home while sick, test, and social distance when possible) are highly effective, all are subject to practical limitations in a work environment.  *Id*.  For example, testing is insufficient because unvaccinated individuals may not test positive until several days into their infection and may, in the interim, inadvertently contribute to significant outbreaks among patients, colleagues, and families.  Cohen Rep. ¶ 35. Masks help prevent acquisition of infection but do not help diminish the severity of symptoms once someone is infected, nor can they be worn constantly, without interruption.  Cohen Rep. ¶ 37.  For this reason, it is unsurprising that many cases of COVID-19 acquired in healthcare settings occurred in breakrooms as well as in the community—an issue of major concern to Legacy given that employees would eat or congregate without masks.  *Id*.; Muller Decl. ¶ 8.

Finally, the benefits of COVID-19 vaccination extended to all healthcare workers, regardless of whether they had previously been infected with the virus (or had what is sometimes referred to as "natural immunity").  Cohen Rep. ¶ 28.  One CDC study found that being

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 7
(CASE #3:22-CV-06004 TMC)

1    unvaccinated was associated with 2.3 higher odds of reinfection compared to being fully

2    vaccinated.  *Id.*  In patients with prior infection, vaccination boosts antibody levels and cell

3    mediated immunity, and increases the duration and spectrum of protection from COVID-19.  *Id*.

4    Accordingly, the CDC recommended universal vaccination regardless of prior infection.  *Id*.

5    **E.    Legacy's Vaccination Efforts**

6            Legacy sought to ensure that information about COVID-19 vaccines was disseminated

7    promptly and accurately.  Muller Decl. ¶ 11.  It made significant efforts to educate employees

8    about the logistics and safety of the COVID-19 vaccines once they became available.  Muller

9    Decl. ¶ 12.  Its outreach included hosting over a dozen town hall meetings for providers to ask

10   questions, creating a comprehensive "Frequently Asked Questions" document for providers,

11   developing a consumer-facing vaccine education website, establishing a hotline for providers to

12   call if they had confidential questions about the vaccines, and providing updates on vaccine

13   safety studies.  *Id*.

14           Legacy's vaccination efforts were swift and expansive.  By December 14, 2020, Legacy

15   had received its first shipment of vaccines; one week later, it had administered almost the entire

16   supply.  Muller Decl. ¶¶ 13-14, Exs. 5-8.  Priority was given to providers (like Higa) who

17   worked in units with a high COVID-19 burden, including the emergency department, intensive

18   care unit, and segregated COVID-19 care centers.  Muller Decl. ¶ 13, Ex. 5. By mid-January

19   2021, Legacy had administered 11,000 first doses of the COVID-19 vaccines to frontline

20   providers and announced that it would soon expand its vaccination efforts to those who worked

21   in the system office.  Muller Decl. ¶¶ 14-15, Exs. 9-10.

22           By March 4, 2021, after all Legacy providers were eligible to receive the COVID-19

23   vaccine, approximately 70% of employees were vaccinated, with 17,600 providers and older

24   residents vaccinated at Salmon Creek since December 23, 2020.  Muller Decl. ¶ 16, Ex. 12.

25   Despite widespread vaccine availability, it appeared that a significant portion of the provider

26   population did not intend to get vaccinated.  *Id*.  Legacy increased its efforts to encourage

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 8
(CASE #3:22-CV-06004 TMC)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

voluntary vaccination through a variety of measures over the next several months, including streamlining the process of scheduling vaccination appointments, working with other healthcare institutions to secure additional space at the Oregon Convention Center to administer COVID-19 vaccines, providing incentivized sick pay for employees who were fully vaccinated, working with staff leaders in units with lower vaccination rates to encourage voluntary vaccination, and offering raffles for fully vaccinated employees.  Muller Decl. ¶ 17.

Those efforts led to some success.  By July 1, 2021, 84% of employees were fully vaccinated.  *Id.*, Ex. 14.  Nevertheless, 16% of the employee population—or approximately 2,240 employees—remained unvaccinated.  Muller Decl. ¶ 19.  The number had remained largely static since March 2021 and was concerning to the SLT, particularly given the medical consensus that vaccination against COVID-19 was the best tool available to reduce the likelihood of infection and transmissibility, along with severe illness and death.  *Id.*; Cohen Rep. ¶¶ 23, 34.

F.    **The Delta Variant**

In summer 2021, the Delta variant became the dominant COVID-19 variant in the United States.  Cohen Rep. ¶ 18.  Compared to prior variants, Delta was not only more transmissible but was also associated with a significantly higher risk of severe disease and hospitalization.  *Id.*  Although COVID-19 cases had declined in early 2021, they abruptly skyrocketed by 1,200% during the Delta surge between June and September 2021, with hospital admissions up by 600% nationwide and, near the peak, a death toll of 1,500 Americans daily.  Cohen Rep. ¶ 29.  Unvaccinated individuals were far more likely to be impacted; for example, a CDC study during the Delta surge showed that people who were unvaccinated were three times (300%) more likely to be infected with COVID-19 compared to those who were fully vaccinated, regardless of age, race, and ethnicity.  Cohen Rep. ¶ 26.

Legacy closely monitored the Delta variant's projected impact on its system.  During daily huddles, senior leaders (including the SLT) often reviewed forecasts, including an Oregon

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 9
(CASE #3:22-CV-06004 TMC)

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

statewide publicly available COVID-19 forecasting model developed by Oregon Health and

Science University epidemiologist Dr. Peter Graven (the "Graven Model"), along with internal

metrics on Legacy's COVID-19 case count and capacity to handle patients at various locations.

Muller Decl. ¶ 21.  In the second half of July 2021 the number of anticipated COVID-19 cases

shot dramatically upward, and both the Graven Model and Legacy's own internal forecasting

began predicting a surge in COVID-19 cases far surpassing previous records.  Muller Decl. ¶¶

22-23, Exs. 17-19.  For example, on July 20, 2021, Legacy's models predicted an upcoming

wave of COVID-19 hospitalizations roughly equivalent to the previous surge in spring 2021.  *Id*.,

Ex. 17.  Only one week later, on July 27, 2021, the models predicted an increase of COVID-19

hospitalizations that would shatter previous records.  *Id*., Ex. 18.  By August 2, 2021, forecasts

for COVID-19 hospitalizations dwarfed (and were simply incomparable to) anything

experienced during the pandemic up until that point.  *Id*., Ex. 19.

Legacy implemented several measures in anticipation of the coming surge, including

reinstituting visitor restrictions, and temporarily pausing non-emergency surgical procedures to

support hospital capacity.  Muller Decl. ¶ 24.  But there was a strong consensus that those

efforts, along with the safety measures that Legacy providers had taken throughout the

pandemic, would not be enough given the gravity of what Legacy and other health systems were

facing and the medical science at the time about the importance of vaccination against COVID-

19.  *Id*.  The SLT was mindful that many healthcare organizations across the country had begun

(or were considering) requiring employees to be vaccinated against COVID-19.  *Id*.  In the end,

the SLT determined that it needed to act.  *Id*.

## G.    Legacy's COVID-19 Vaccination Policy

On August 5, 2021, Legacy announced to all providers that it was enacting the

Vaccination Policy, which required that all Legacy "caregivers"[6] become fully vaccinated

---

[6] The term "caregiver" included: "physicians (employed and independent), credentialed medical staff (as well as their employed, contracted, and/or sponsored advanced practice providers), fellows, residents, interns, advanced

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 10
(CASE #3:22-CV-06004 TMC)

against COVID-19, or have an approved exception, by September 30, 2021.[7]  Muller Decl. ¶ 25, Exs. 20-21.  The Vaccination Policy was broadly disseminated via Legacy's internal broadcast system and emails to everyone impacted.  *Id.*

The SLT's decision to enact the Vaccination Policy was not made lightly.  Muller Decl. ¶ 26.[8]  Multiple internal stakeholders, including experts in infectious diseases and infection control, worked with the SLT on the development and implementation of the policy, along with Legacy leaders in the Human Resources, Employee Health, Ethics, Operations, Compliance, and Legal Departments.  *Id.*  In a message to all providers, Legacy's then-Chief Human Resources Officer and former SLT member, Sonja Steves, stated:

> In my 33 years at Legacy, I can't recall a policy decision that was more complex or carried as much weight as our decision to require all employees to be vaccinated against COVID-19 . . . [o]ur goal is not to penalize employees, providers or vendors with this requirement.  It is quite simply to ensure the safety of our people, our patients and our community.  Above all else, providing a safe environment to receive and deliver care is our most important act, and the science has shown that vaccines are safe and effective in helping us do that.

Muller Decl. ¶ 27, Ex. 22.

The SLT ultimately determined that the Vaccination Policy was necessary for many reasons. First and foremost, available vaccines were safe and highly effective at preventing infection and reducing cases of severe illness and death. Muller Decl. ¶ 28. Vaccinated individuals tended to carry a lower viral load and were thus less likely to spread COVID-19. *Id.*

---

practices providers, nurses, clinical and non-clinical employees, students, volunteers, clergy, contracted personnel, vendors, and any others who conduct business or perform services within Legacy locations."  Muller Decl. ¶ 25, Ex. 21.

[7] The September 30, 2021 deadline was later extended to October 18, 2021, Muller Decl. ¶ 25, which coincided with the date of the deadline in Washington Governor Inslee's Proclamation. Wash. Proclamation No. 21-14 (Aug. 9, 2021).

[8] While COVID-19 represented a unique challenge, vaccination policies for health and safety reasons were not new to Legacy.  Muller Decl. ¶ 26.  Prior to the Vaccination Policy, Legacy had already implemented policies regarding numerous vaccines, including the flu vaccine, subject to eligible declinations depending on the virus.  *Id.*

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 11
(CASE #3:22-CV-06004 TMC)

1  Vaccination against COVID-19 also provided all of the benefits—with none of the limitations—

2  of other safety measures such as testing and PPE usage. *Id.*

3  The SLT also considered that many in Legacy's patient population were particularly

4  susceptible to severe illness and death from COVID-19 due to their age and/or pre-existing

5  medical conditions, and that the Delta variant was spreading quickly and would stress Legacy's

6  already overburdened system. *Id.* Legacy also had a responsibility to protect patients and

7  providers from unreasonable safety risks, and needed to maintain adequate staffing levels to

8  provide high-quality patient care (and would be less likely to do so if employees were out ill with

9  COVID-19). *Id.* Furthermore, Legacy was committed to ensuring that members of the public felt

10  safe accessing medical care at its facilities and believed that ensuring all employees were fully

11  vaccinated would help foster that trust. *Id.*

12  Legacy established and communicated with employees about a process for submitting

13  exception requests and established a Vaccine Exception Work Group including primary care

14  doctors, immunologists and infectious disease specialists, ethicists, and clergy members to

15  review employee requests for medical and religious exceptions from the Vaccination Policy.

16  Muller Decl. ¶ 29.

17  The SLT continued evaluating whether employees with approved exceptions could be

18  accommodated in on-site roles.  Muller Decl. ¶ 30.  Ultimately, the SLT determined that,

19  consistent with available science, having unvaccinated employees on-site presented an

20  unreasonable health and safety risk, and it made only a handful of exceptions for individuals who

21  could do their jobs privately and without the possibility of encountering other providers or

22  patients.  *Id.*  In discussing these issues, the SLT was cognizant of the fact that transmissions

23  were still occurring even as Legacy took all appropriate steps to prevent them, increasing the risk

24  of patient or provider infection, provider absences, and other undesirable consequences that

25  hindered Legacy's ability to provide the safest possible care and work environment.  Cohen Rep.

26  ¶ 33; Muller Decl. ¶ 31.  The SLT determined that the potential harm that could result from

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 12
(CASE #3:22-CV-06004 TMC)

1  allowing even a single unvaccinated employee to come into contact with patients (some of whom

2  are so vulnerable to infection that everyday items such as fresh fruit or flowers are not allowed

3  into their rooms) or other providers was unacceptable.  Muller Decl. ¶ 31.  The SLT was also

4  mindful that hundreds of employees had requested exceptions, which only multiplied the risk.

5  *Id.*

6      The information Legacy continued to receive in the weeks after announcing the

7  Vaccination Policy underscored the decision that its enactment had been a critical component of

8  keeping its facilities safe.  An August 19, 2021 employee news bulletin notified employees that:

> The highly contagious COVID-19 Delta variant continues to send people to
> Oregon hospitals at alarming rates in this fifth wave of the pandemic.  The
> COVID-19 models paint a grim picture with Legacy expecting to see anywhere
> between 174 to 194 COVID-19 patients by next week.  Those would be the
> highest one-day totals since the pandemic started.

13  Muller Decl. ¶ 32, Ex. 23.

14      Additionally, the patients that arrived at Legacy were, by and large, unvaccinated.  *See*

15  Muller Decl. ¶ 33 & Ex. 25 (showing that at Legacy as of late August 2021 over 85% of

16  COVID-19 patients hospitalized were unvaccinated, and 90% of COVID-19 patients on a

17  ventilator and 91% of COVID-19 patients in the ICU were unvaccinated).

18      All told, the Vaccination Policy was a success for employee and patient safety.  Muller

19  Decl. ¶ 34.  By October 2021, 96% of Legacy employees were fully vaccinated.  *Id.*, Ex. 26.

20  And, although Legacy lost many dedicated employees who elected not to comply with the

21  Vaccination Policy, its decision to act quickly was prudent in light of what was to come.  *Id.*

22  ICU admissions at Legacy facilities peaked in September 2021 and nearly 200 COVID-19-

23  positive patients were receiving care within the system at various points that month, a dramatic

24  increase from previous highs in December 2020.  *Id.*, Ex. 27.

25

26

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 13
(CASE #3:22-CV-06004 TMC)

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone* 206.624.0900

**H.      Governor Inslee's Proclamation 21-14 and Legacy's Covid-19 Vaccination Policy**

At the same time Legacy was implementing its Vaccination Policy, the state of Washington was also taking steps to address the heightened risk presented by the Delta variant. On August 9, 2021, Washington Governor Jay Inslee issued Proclamation 21-14 which, among other things, prohibited:  "Any Health Care provider from failing to be fully vaccinated against COVID-19 after October 18, 2021; and Any individual or entity that operates a Health Care Setting from permitting a Health Care Provider to engage in work for the individual or entity as an employee, contractor, or volunteer after October 18, 2021 if the Health Care Provider has not been fully vaccinated against COVID-19 and provided proof thereof to the individual or entity." Wash. Proclamation No. 21-14 (Aug. 9, 2021).  With respect to being "fully vaccinated," the Proclamation provides that:

> A person is fully vaccinated against COVID19 **_two weeks after_** they have received the second dose in a two-dose series of a COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA (e.g., Pfizer-BioNTech or Moderna) or **_two weeks after_** they have received a single-dose COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA (e.g., Johnson & Johnson (J&J).

*Id*. (emphasis added).

Accordingly, to be fully vaccinated by October 18, 2021, Legacy's health care providers had to receive two doses of the Pfizer-BioNTech or Moderna, or one dose of the J&J vaccine by October 6, 2021.

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 14
(CASE #3:22-CV-06004 TMC)

**STOEL RIVES** LLP
ATTORNEYS
**600 University Street, Suite 3600, Seattle, WA  98101**
*Telephone 206.624.0900*

I.   **Plaintiffs' Employment with Legacy**

  1.   **Plaintiff Toby Higa—Physician Assistant**

Plaintiff Higa was hired by Northwest Acute Care Specialists ("NACS") in September 2018.  Transcript of Deposition of Toby Higa (hereinafter "Higa Tr.") at 25:15-16.[9]  Pursuant to a contract between NACS and Legacy, Higa was employed at Legacy's Salmon Creek Medical Center ("Salmon Creek") as a physician assistant in the emergency department.  *Id.*, Ex. B.  Higa is still employed with NACS and continues to work at Salmon Creek as a physician assistant to the current day.  Higa Tr. 114:8-12.

Higa's work as a physician assistant in the emergency room at Salmon Creek ubiquitously required his direct, in-person contact with Legacy's patients and other providers. *Id.* 16:20-22, 42:13-44:3; Doyer Decl., Ex. C. To wit, Higa's essential job duties included physical examinations of the patients under his care. Higa Tr. 42:13-44:3, 124:19-125:6, 126:17-129:22.  According to Higa, on a typical day, his first task was to "sit in the triage booth with a nurse for, depending on the shift, one to three hours . . . doing a medical screening exam on patients." *Id.* 42:13-18.  The remainder of his shift consisted of a mix of "direct contact" with patients and other providers, "reviewing labs, reviewing consultation notes, [and] changing medications." *Id.* 43:3-10. Higa admitted that he "could not perform all [his] job duties at Legacy, as they existed in August-October 2021, without having direct and in-person contact with co-workers and patients." Doyer Decl., Ex. C. He also made the same admissions in his complaint to the Oregon Bureau of Labor and Industries ("BOLI"). *Id.*, Ex. D at 107 ("[d]ue to my occupation, I can only be involved with patient care"), Ex. E at 115; *see also* Higa Tr. 124:19-125:6.

On October 14, NACS sent an email to Higa informing him that he was being placed on an unpaid leave since he had yet to provide documentation that he would be fully vaccinated by

---

[9] The Higa Deposition Transcript is attached as Exhibit A to the Doyer Declaration.

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 15
(CASE #3:22-CV-06004 TMC)

October 18, 2021. Doyer Decl., Ex. H at 150. On October 15, 202, Higa received the Johnson &
Johnson COVID-19 vaccine. On the same day, he emailed proof of vaccination to NACS, which
then forwarded it to Legacy. *Id.* On October 16, NACS emailed Higa to inform him that he
would be placed back on the schedule at Salmon Creek on October 30—the first day that he
would be fully vaccinated (after receiving the Johnson & Johnson vaccine on October 15). *Id.*,
Ex. I. Higa continued working at Salmon Creek beginning October 30. Higa Tr. 118:24-119:6).

### 2. Plaintiff Aimee Sweet—Respiratory Therapist

Plaintiff Sweet was hired at Legacy as a respiratory therapist in 2015 and worked at
Salmon Creek. Brody Complaint, ¶ 19. Sweet's job duties included "handl[ing] all clinical
applications of respiratory care" in intensive care units (including the neonatal intensive care
unit) and the emergency room. Doyer Decl., Ex. J. She states that she "set up and maintained . . .
ventilators," and various types of continuous positive airway pressure ("CPAP") machines for
her patients. *Id.* She also performed pulmonary function tests ("PFTs"), checked vital signs,
"[p]rovided aerosolized medication delivery," and even "performed sputum induction" (inducing
a patient to expel mucus from the respiratory tract). *Id.*

### 3. Plaintiff Risa Brody—Registered Nurse

Plaintiff Risa Brody was hired at Legacy as a registered nurse in 2018. *Id.*, Ex. K. Brody
worked as a staff nurse in Salmon Creek's Neonatal Intensive Care Unit ("NICU"), providing
direct, in-person care to critically ill infants, including managing intubation and ventilation lines,
collaborating with respiratory therapists, and performing resuscitations. *Id.*, Ex. L. Brody admits
that she "could not perform all [her] job duties at Legacy, as they existed in August-October
2021, without having direct and in-person contact with co-workers and patients." *Id.*, Ex. M at
173.

### 4. Plaintiff Damaris Brici—Registered Nurse

Plaintiff Damaris Brici was hired at Legacy as a registered nurse in November 2020. *Id.*,
Ex. N. Brici worked as a staff nurse and then a charge nurse in the Surgery Department,

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 16
(CASE #3:22-CV-06004 TMC)

providing direct, in-person care including supervising healthcare personnel, preparing patients, rooms, sterile instruments, equipment, and supplies for surgery, operating, assembling, or adjusting lights, suction machines, and diagnostic equipment, caring for and disposing of tissue specimens, and preparation and application of dressings following surgery. *Id.*, Ex. O.

### 5. Plaintiff Brianna Hall—Registered Nurse

Plaintiff Brianna Hall was hired at Legacy in 2005 and began working as a nurse in Preadmission Services at Salmon Creek in 2020, *id.*, Ex. P, where her job frequently required her to have incidental contact with patients, families, and providers. Declaration of Julie McPhedran, ¶ 4. Nurses in preadmission services work in offices that are located either in the main hospital building or the medical office building. *Id.* at ¶ 5–6. It is impossible to avoid walking through the hospital or medical services buildings to reach these offices, as there is no direct, private access. *Id.* In other words, accessing them requires entering through hospital areas shared with patients, families, and other providers. *Id.*

Hall's job duties also required that she provide some direct, in-person care as well, as a small number of patients came to the lab each week and required direct interaction with staff nurses, such as Hall, in preadmissions services. *Id.*, ¶ 7. These patients may, for example, have questions about blood products or need to obtain a nutrition supplement. *Id.* Hall was also subject to being called to work in the hospital at any time should the need arise, such as from a large-scale disaster or public health crisis, such as a viral epidemic like COVID-19. *Id.*, ¶ 8.

### 6. Plaintiff Ivan Atanassov—Respiratory Therapist

Plaintiff Ivan Atanassov was hired at Legacy in June 2012, Doyer Decl., Ex. Q, and in 2021 was working at Salmon Creek as a respiratory therapist providing direct, in-person care including, as described by Atanassov: "Assess patients, breathing treatments, ventilator management, intubation assist, cough assist, chest physical therapy, extubation, ekg, non-invasive ventilation set ups, [and] ABGs[.]" *Id.*, Ex. R at 191.

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 17 (CASE #3:22-CV-06004 TMC)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

122859933.7 0015023-00428

1

### 7.  Plaintiff Daniela Marianu—Registered Nurse

2      Plaintiff Daniela Marianu was hired at Legacy in April 2010, *id.*, Ex. S, and in 2021 was

3  working in the NICU at Salmon Creek providing direct, in-person care to critically ill infants,

4  including providing "physical care for neonatal patients," caring for "babies that were in critical

5  condition . . . help[ing] parents with baby care," and collaborating with nutritionists. *Id.*, Ex. T at

6  201. Marianu admits that she "could not perform all [her] job duties at Legacy, as they existed in

7  August-October 2021, without having direct and in-person contact with co-workers and

8  patients." *Id.*, Ex. U at 208.

9

### 8.  Plaintiff Angela Loghry—Registered Nurse

10      Plaintiff Angela Loghry worked for Legacy for several years, *id.*, Ex. V, moving into the

11  position of charge nurse in the Salmon Creek NICU in January 2021 where she provided direct,

12  in-person care to critically ill infants, including "care of neonatal patients" and "attend[ing] birth

13  deliveries." *Id.*, Exs. W at 217 & X. Loghry also supervised other nurses and "[f]illed [the]

14  neonatal resuscitation role as needed." *Id.*, Ex. X. Loghry admits that she "could not perform all

15  [her] job duties at Legacy, as they existed in August-October 2021, without having direct and in-

16  person contact with co-workers and patients." *Id.*, Ex. Y at 225.

17

### 9.  Plaintiff Harold Williams—Distribution Technician

18      Plaintiff Harold Williams was hired at Legacy in 2009, *id.*, Ex. Z, and in October 2021

19  was working at Salmon Creek as a Distribution Technician where his daily work involved

20  frequent incidental contact with patients and families and frequent direct contact with other

21  Legacy staff and providers. Declaration of Trent Larsen, ¶ 4. His job was primarily to receive

22  mail and freight and to deliver it around the Salmon Creek campus. *Id.*, ¶ 6. Each workday, Mr.

23  Williams would deliver mail, packages, equipment, and other items to different desks, offices,

24  and storerooms throughout Salmon Creek, including the Imaging Department, Surgical Services,

25  various nurse's stations, and supply closets. *Id.* Mr. Williams spent on average around 2–3 hours

26  per day traveling around Salmon Creek facilities making deliveries. *Id.*

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 18
(CASE #3:22-CV-06004 TMC)

1       While Williams' job typically did not require him to enter patient care rooms, his job did

2   require him to frequently travel through areas of the hospital shared with medical providers. *Id.*,

3   ¶ 7. It also required him to visit different departments throughout the hospital and medical

4   services building, and to deliver to locations where providers worked, such as nurse's stations.

5   *Id.* When Mr. Williams was working at the receiving dock, he worked alongside other employees

6   who also then traveled throughout Salmon Creek facilities. *Id.* He was also required to interact

7   with clinical staff who came to the receiving area to pick up certain packages (for example, if a

8   package was needed for a procedure that was scheduled for the same day it arrived). *Id.*

9   ### III.  SUMMARY JUDGMENT STANDARD

10      The Court shall grant summary judgment if the movant shows that there is no genuine

11  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

12  R. Civ. P. 56(a).  "In deciding whether there is a genuine dispute of material fact, the court must

13  view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the

14  nonmoving party."  *Withey v. Fed. Bureau of Investigation*, 477 F. Supp. 3d 1167, 1171 (W.D.

15  Wash. 2020).

16      The moving party bears the burden of establishing the absence of a genuine issue of

17  material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the

18  nonmoving party to come forward with "specific facts showing that there is a genuine issue for

19  trial."  *Withey*, 477 F. Supp. 3d at 1171.  Ultimately, summary judgment is appropriate against a

20  party who 'fails to make a showing sufficient to establish the existence of an element essential to

21  that party's case, and on which that party will bear the burden of proof at trial.'"  *Id.* (quoting

22  *Celotex*, 477 U.S. at 322).  Although the Court views Plaintiffs' evidence in their favor,

23  *Anderson*, 477 U.S. at 255, conclusory, speculative testimony is insufficient to raise a genuine

24  issue of fact and defeat summary judgment, *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*,

25  594 F.2d 730, 738 (9th Cir. 1979).

26

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 19
(CASE #3:22-CV-06004 TMC)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## IV.  ANALYSIS AND ARGUMENT

**A.    Plaintiffs Cannot Establish the Elements for a Claim for Religious Discrimination Under Title VII, 42 U.S.C. § 2000e-2, or the Washington Law Against Discrimination ("WLAD"), RCW 49.60.180[10]**

As is clear from the record, Higa has never been an employee of Legacy.  Higa is an employee of NACS and serves as a contract medical services provider for Legacy.  Legacy has no employment relationship with Higa and thus his Title VII claims against Legacy must fail. *See Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1292 (9th Cir. 1999) ("Title VII protects employees, but does not protect independent contractors."). The Title VII claims of Plaintiffs Marianu and Atanassov also fail because none of them filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), which is an express prerequisite to bringing the Title VII claims they have brought here. 42 U.S.C. § 2000e-5(e)(1); *Scott v. Gino Morena Enterprises, LLC*, 888 F.3d 1101, 1106 (9th Cir. 2018).

Regardless, all the Plaintiffs' Title VII and WLAD claims lack merit.  To properly plead a religious discrimination claim under both federal and state law, [11]  a plaintiff must allege: (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement. *Heller v. EBB Auto. Co.*, 8 F.3d 1433, 1438 (9th Cir.1993).[12]

---

[11] The analysis of all the Plaintiffs' state and federal claims in this lawsuit are identical. *Black v. Grant Cnty. Pub. Util. Dist.*, No. 2:17-CV-365-RMP, 2019 WL 2617236, at *7 (E.D. Wash. June 26,2019), *aff'd in part and rev'd in part on other grounds*, 820 F. App'x 547 (9th Cir. 2020); *Suarez v. State*, 23 Wn. App. 2d 609, 620-21 (2022), *review granted in part, denied in part,* 200 Wn.2d 1026 (2023); *Kumar v. Gate Gourmet Inc.*, 180 Wn.2d 481, 501 (2014); Toby Higa Amended Complaint ¶ 56.

[12] Each of Plaintiffs' complaints brings the sole claim that Legacy violated Title VII and WLAD by failing to provide their requested religious accommodation. Williams Comp. at 5–6; Higa Comp. at 8–11; Marianu Comp. at 6–7; Brody Comp. at 6–7.

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 20
(CASE #3:22-CV-06004 TMC)

**B.    Higa Never Suffered an Adverse Employment Action**

Higa cannot establish he was ever subjected to or threatened with an adverse employment action.  Higa's privileges were temporarily held and NACS placed him on administrative leave when he did not comply with the Vaccination Policy by the established deadline (i.e., being fully vaccinated by October 18). *Id.*, Ex. H at 150. Higa elected to receive the J&J vaccine on October 15 and returned to work after fourteen days, on October 30, when he was fully vaccinated, as required under Legacy's Vaccine Policy and Washington State law. *Id.*, Ex I; Wash. Proclamation No. 21-14 (Aug. 9, 2021).  Higa's assignment at Salmon Creek has remained uninterrupted to this day.

**C.    Plaintiffs' Requested Accommodation—To Be Permitted to Work Directly with Patients and Other Providers Without Being Vaccinated Against COVID-19—Is Unduly Burdensome and Therefore Not Reasonable**

Legacy is not required to accommodate Plaintiffs' alleged religious beliefs if doing so would impose an "undue hardship." *Groff v. DeJoy*, 600 U.S. 447, 453 (2023).  An employer establishes undue hardship under Title VII and WLAD by demonstrating that a religious accommodation would result in "substantial increased costs in relation to the conduct of its particular business." *Id.* at 470-71 (directing courts to "take[] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer," when evaluating undue hardship). Importantly, the "costs" to be examined as part of an undue hardship analysis are not limited to actual monetary expenses an employer might incur.  Rather, "an accommodation's effect on co-workers may have ramifications for the conduct of the employer's business" so long as the effect is not "attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice[s]." *Id.* at 472.  "Costs" may include not only "hardship on the plaintiff's coworkers," *Opuku-Boateng v. California*, 95 F.3d 1461, 1468 (9th Cir. 1996), but also an increase in safety and liability hazards in the workplace, *see Bhatia v.*

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 21
(CASE #3:22-CV-06004 TMC)

1   *Chevron U.S.A., Inc.*, 734 F.2d 1382, 1383-84 (9th Cir. 1984); *Bordeaux v. Lions Gate Ent., Inc.*,

2   No. 222CV04244SCWPLA, 2023 WL 8108655, at *13-14 (C.D. Cal. Nov. 21, 2023).[13]

3          The EEOC's Guidance for employers regarding COVID-19-related workplace

4   accommodations[14] is in accord and states in relevant part:

5   • "Costs to be considered [when assessing accommodation requests] include not only direct

6      monetary costs but also the burden on the conduct of the employer's business."

7   • "When an employer is assessing whether exempting employees from getting a

8      vaccination would impair workplace safety, it may consider, for example, the type of

9      workplace, the nature of the employees' duties, the location in which the employees must

10     or can perform their duties, the number of employees who are fully vaccinated, how

11     many employees and nonemployees physically enter the workplace, and the number of

12     employees who will in fact need a particular accommodation."

13  • An employer "is not obligated to provide the reasonable accommodation preferred by the

14     employee" and "may consider the cumulative cost or burden of granting accommodations

15     to other employees."

16  EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and*

17  *Other EEO Laws*, at Section L.3 (updated July 12, 2022), Section L.4 (updated Mar. 1, 2022),

18

19

_____

20  [13] Title VII decisions issued before *Groff* remain persuasive because *Groff* did not materially change the analysis in
    undue hardship cases. Rather, the Supreme Court in *Groff* clarified its previous opinion in *Trans World Airlines,*

21  *Inc. v. Hardison*, 432 U.S. 63, 84 (1977), which stated in one passage that to "require [an employer] to bear more
    than a *de minimis* cost" to provide a religious accommodation "is an undue hardship," *id.* The *Groff* Court noted

22  that "*Hardison* cannot be reduced to that one phrase" and instructed that when evaluating whether a hardship is
    either "more than de minimis" or "substantial," courts should continue to examine how an asserted burden affects

23  "the conduct of [the employer's] particular business." 600 U.S. at 468-71 (instructing courts to "resolve whether a
    hardship would be substantial in the context of an employer's business in the common-sense manner that it would

24  use in applying any such test"); *id.* at 472-73, 476 (noting specifically that non-economic costs such as the effect on
    other employees and increased safety risks remain appropriate considerations).

25  [14] The Court in *Groff* noted that the EEOC's guidance about undue hardship "is sensible and will, in all likelihood,
    be unaffected by our clarifying decision." *Groff*, 600 U.S. at 471. It has continued to be cited by courts post-*Groff*.

26  *See, e.g.*, *Bordeaux*, 2023 WL 8108655, at *8.

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 22
(CASE #3:22-CV-06004 TMC)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

1    Section L.5 (updated Mar. 1, 2022), https://www.eeoc.gov/wysk/what-you-should-know-about-

2    covid-19-and-ada-rehabilitation-act-and-other-eeo-laws.

3    　　　Applying these concepts, courts have held both before and after *Groff* that unvaccinated

4    employees may themselves be safety and liability hazards, whose workplace presence presents

5    an undue hardship given the risk they present to others around them.  *See, e.g.*, *Dennison v. Bon*

6    *Secours Charity Health Sys. Med. Grp., P.C.*, No. 22-CV-2929 (CS), 2023 WL 3467143, at *6

7    n.7 (S.D.N.Y. May 15, 2023) (noting the "obvious hardship associated with the increased health

8    and safety risk posed to other employees and patients by allowing Plaintiffs to remain

9    unvaccinated while working at the[] [employer's] facilities"); *Beickert v. N.Y.C. Dep't of Educ.*,

10   No. 22-CV-5265(DLI)(VMS), 2023 WL 6214236, at *5 (E.D.N.Y. Sept. 25, 2023) (finding that

11   "[i]t is beyond cavil that safety within any work environment, especially an educational work

12   environment, is of absolute importance," and dismissing the plaintiff's claims because their

13   "unvaccinated presence would have imposed 'substantial increased costs in relation to the

14   conduct of [defendant's] particular business' by creating a health and safety risk," which "alone

15   would have established an undue hardship on the [defendant] warranting dismissal of [plaintiff's]

16   claim").

17   　　　More specifically, in the summary judgment context and as jurisprudence in this area

18   continues to evolve, courts have found that Title VII does not require employers to allow an

19   unvaccinated employee—including one who has an approved exception from a COVID-19

20   vaccination requirement—to continue working on-site if doing so causes a health and safety risk

21   to others.  For example, relying on *Groff*, the court in *Bushra v. Main Line Health, Inc.*, No. CV

22   23-1090, 2023 WL 9005584, at *8 (E.D. Pa. Dec. 28, 2023), granted a healthcare employer's

23   motion for summary judgment against a Title VII failure to accommodate claim, stating:

24   　　　　　[I]t cannot be disputed that without the [COVID-19] vaccine, [plaintiff] was at
              great risk of contracting and transmitting the disease because he had frequent and
25            direct contact with patients and staff as a doctor in the emergency room.
              Unvaccinated, [plaintiff] risked infecting and even causing the death not only of
26            his colleagues and [the employer's] staff but also of vulnerable patients.  The

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 23
(CASE #3:22-CV-06004 TMC)

1  ability of [the employer] to continue its mission of caring for, treating, and
2  healing the sick and injured would have been severely impaired with an
   unvaccinated [plaintiff] in its midst.  In sum, there can be no doubt that [the
3  employer] would have incurred undue hardship in the form of substantial, if not
4  economic, costs if it had been required to accommodate [plaintiff's] religious
   beliefs.

5  *Id.*  In *Isaac v. Executive Office of Health & Human Services*, the court granted the employer's

6  motion for summary judgment in part because "[plaintiff] could not work her proposed hybrid

7  schedule without risking the health and safety of the individuals assigned to her (some of whom

8  were particularly vulnerable to COVID-19 due to their age or living situation) and imposing

9  'substantial increased costs'" on the employer.  No. CV 22-11745-RGS, 2023 WL 8544987, at

10 *2 (D. Mass. Dec. 11, 2023).

11      The premise that allowing unvaccinated employees on-site is an undue hardship is not

12 limited to healthcare employers.  A district court in the Ninth Circuit reached a similar

13 conclusion in a case involving a film production company that determined it was unsafe to allow

14 an actress to continue working.  *See Bordeaux*, 2023 WL 8108655, at *13 (granting employer's

15 motion for summary judgment and holding that "[a]ccommodating Plaintiff's exemption request

16 would have put the lives of her fellow cast and crew members in danger . . . [i]n and of itself, this

17 safety risk constitutes an undue hardship").[15]

18      The above decisions are consistent with longstanding Title VII precedent affirmatively

19 establishing that risks to health and safety are sufficient to demonstrate undue hardship.  *See,*

20

21

22 ───────────────
   [15] Courts reached similar conclusions when evaluating requests for preliminary injunction that would have allowed
23 unvaccinated employees to continue working on-site.  *See, e.g.*, *Together Emps. v. Mass Gen. Brigham Inc.*, 573 F.
   Supp. 3d 412, 437 (D. Mass. 2021) (preliminary injunction order concluding that hospital defendant "has established
24 a likelihood of success on its contention that granting the requested accommodations . . . of masking, periodic
   testing, and social distancing, would pose an undue hardship"), *aff'd*, 32 F.4th 82 (1st Cir. 2022); *O'Hailpin v.
25 Hawaiian Airlines, Inc.*, 583 F. Supp. 3d 1294, 1309-10 (D. Haw. 2022) (preliminary injunction order concluding
   that because of the "increased risk that unvaccinated employees in close quarters pose to other employees and
26 passengers" defendant airline "persuasively demonstrate[d] that accommodating Plaintiffs would cause undue
   hardship"); *Barrington v. United Airlines, Inc.*, 566 F. Supp. 3d 1102, 1108-09 (D. Colo. 2021) (same).  For the
   reasons discussed in fns. 13–14, *supra*, this authority remains applicable following the *Groff* decision.

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 24
(CASE #3:22-CV-06004 TMC)

*e.g.*, *Bhatia*, 734 F.2d at 1383-84 (holding that Title VII did not require employer to accommodate plaintiff by ensuring that plaintiff was not placed in assignments "involv[ing] potential exposure to toxic gases," which would in turn force plaintiff's coworkers to "assume [plaintiff's] share of potentially hazardous work").  Numerous courts have held that Title VII does not require employers to accommodate requests for a religious exception from a vaccination requirement at the risk of the health and safety of others.  *See Robinson v. Children's Hosp. Bos.*, No. CV 14-10263-DJC, 2016 WL 1337255, at *10 (D. Mass. Apr. 5, 2016) (granting employer's motion for summary judgment and holding that the proposed accommodations were unreasonable because, "[h]ad the Hospital permitted [plaintiff] to forgo the vaccine but keep her patient care job, the Hospital could have put the health of vulnerable patients at risk"); *Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. CV 19-5734, 2022 WL 507479, at *8 (E.D. Pa. Feb. 18, 2022) (granting employer's motion for summary judgment in light of the "danger posed by . . . Plaintiff receiving an exemption and being permitted to wear a mask," which would "result in an undue burden to [the employer]").

1. **Allowing Plaintiffs to Continue Working Unvaccinated Would Have Substantially Increased Health and Safety Risks at Legacy, Thus Resulting in Undue Hardship**

Given the undisputed facts of this case, Legacy reasonably concluded that allowing unvaccinated providers like Plaintiffs to work on-site would present a material health and safety risk, resulting in substantial increased costs for Legacy.  Muller Decl. ¶¶ 28, 30-31.  The information Legacy had at the time was that COVID-19 vaccines were safe and highly effective at preventing infection, reducing transmission, and reducing the odds of severe illness and death, and that the new COVID-19 Delta variant would (and did) result in a surge of new patients in Legacy's facilities. Muller Decl. ¶¶ 8, 10, 23, 28, 32–34; Cohen Rep. ¶¶ 19, 23, 25, 28–30, 33–

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 25 (CASE #3:22-CV-06004 TMC)

122859933.7 0015023-00428

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

38. It is also undisputed Plaintiffs' roles required them to work on-site and interact directly with Legacy patients and staff.[16]

In sum, Legacy reasonably concluded that allowing providers like Plaintiffs to continue performing patient care on-site would have made its facilities less safe, Muller Decl. ¶¶ 28, 30-31.[17]  The health and safety risks to others posed by allowing an unvaccinated provider to work in a hospital setting are sufficient, standing alone, to establish undue hardship.  *Bushra*, 2023 WL 9005584, at *8; *Bordeaux*, 2023 WL 8108655, at *13.  Moreover, the additional operational consequences that would have flowed from allowing unvaccinated providers to continue working—including an increased risk that those providers would acquire COVID-19, be absent from work, and hinder Legacy's ability to provide the best possible care during the pandemic—also rise to the level of a substantial increased cost for Legacy.  Muller Decl. ¶ 31; Cohen Rep. ¶¶ 33, 34.

For all the above reasons, it is indisputable that Plaintiffs' proposed accommodations would have led to decreased safety at Legacy's facilities and negatively impacted Legacy's ability to provide necessary patient care, resulting in substantial increased costs to Legacy. Legacy and the unidentified "Doe" Defendants are entitled to summary judgment.

## V.  CONCLUSION

For the reasons discussed above, Legacy respectfully requests the Court dismiss each Plaintiff's claims in their entirety with prejudice.

---

[16] *See* discussion, cited declarations, and exhibits *supra* Section II.I.

[17] Pursuant to the EEOC's Guidance, Legacy was also entitled to, and did consider, "the cumulative cost or burden of granting accommodations to other employees."  Muller Decl. ¶ 31; EEOC Section L.5, *supra*.  Legacy received hundreds of requests for religious or medical exceptions from the Vaccination Policy.  Muller Decl. ¶ 31.  The SLT was cognizant of the potential harm that could result from allowing even a single unvaccinated employee to come into contact with patients or other employees, and was also mindful that hundreds of employees had requested exceptions, which only multiplied the risk.  *Id.*; Cohen Rep. ¶¶ 24, 33.

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 26
(CASE #3:22-CV-06004 TMC)

**STOEL RIVES** LLP
ATTORNEYS
**600 University Street, Suite 3600, Seattle, WA  98101**
*Telephone 206.624.0900*

1    I certify that this memorandum contains 9306 words, in compliance with the Local Civil

2    Rules and the Court's Minute Order of May 29, 2024 (Dkt #34) granting Defendant's request to

3    file an over-length brief.

4

5    DATED:  May 31, 2024.                                  STOEL RIVES LLP

6

7

8    _____
     Adam S. Belzberg, WSBA No. 41022
     Aaron R. Doyer, WSBA No. 60095
9    600 University Street, Suite 3600
     Seattle, WA  98101
10   Telephone:  206.624-0900
     Email: adam.belzberg@stoel.com
11   Email: aaron.doyer@stoel.com

12                                                          *Attorneys for Defendant Legacy Health*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 27
(CASE #3:22-CV-06004 TMC)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on May 31, 2024, I electronically filed the foregoing with the Clerk

3  of the Court using the CM/ECF system which will send notification of such filing to the parties

4  in the above case listed below:

5
       Harold H. Franklin, Jr., WSBA #20486      ☒      email:
6      Pacific Justice Institute                              haroldfranklin1@comcast.net
       459 Seneca Avenue NW                       ☐      first class mail
7      Renton, WA  98057                          ☐      hand delivery
       Phone:       206-617-7031                  ☐      facsimile transmission
8                                                 ☐      overnight delivery

9      *Attorneys for All Plaintiffs*

10     Tracy Tribbett                             ☒      email:
       Pacific Justice Institute                              ttribbett@pji.org
11     6404 Three Rivers Drive                    ☐      first class mail
       Pasco, WA 99301                            ☐      hand delivery
12     Phone:       509-713-9868                  ☐      facsimile transmission
                                                  ☐      overnight delivery
13
       *Attorneys for Plaintiff Toby Higa*
14

15     Benjamin J. Stone, WSBA #33436            ☒      email:
       Kylene Slocum, WSBA #58600                         Benjamin.Stone@lewisbrisbois.com
16     Lewis Brisbois Bisgaard & Smith LLP                Kylene.Slocum@lewisbrisbois.com
       1111 Third Avenue, Suite 2700                      Tami.Foster@lewisbrisbois.com
17     Seattle, WA  98101                         ☐      first class mail
       Phone:       206-436-2020                  ☐      hand delivery
18                                                ☐      facsimile transmission
       *Attorneys for Defendant Northwest*        ☐      overnight delivery
19     *Acute Care Specialists*

20
       DATED:  May 31, 2024 at Seattle, Washington.
21

22
                                   *s/ Brie Carranza*
23                                 Brie Carranza, Practice Assistant

24

25

26

DEFENDANT LEGACY HEALTH'S MOTION FOR SUMMARY JUDGMENT - 28
(CASE #3:22-CV-06004 TMC)