UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| WILLIAMS et al,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>LEGACY HEALTH et al,<br><br>　　　　　Defendants. | Case No. 3:22-cv-06004-TMC<br><br>ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |

## I.　INTRODUCTION

Plaintiffs Harold C. Williams, Jr., Toby Higa, Daniela Marianu, Angela Loghry, Ivan Atanassov, Risa Brody, Aimee Sweet, Damaris Brici, and Brianna Hall are current or former employees or contractors of Defendants Legacy Health and Northwest Acute Care Specialists. During the COVID-19 pandemic, all of the plaintiffs worked in roles that required them to either perform patient care or interact with patients and other healthcare workers on a daily basis. They claim that Defendants failed to accommodate their religious beliefs when they did not approve their applications for religious exemption from Defendants' mandatory COVID-19 vaccination policies. *See* Dkt. 1, 40. Plaintiffs assert that Defendants violated Title VII and the Washington Law Against Discrimination (WLAD) when they failed to accommodate their bona fide religious beliefs that led Plaintiffs to refuse vaccination. *Id*. Before the Court are Defendants' motions for

summary judgment. Dkt. 35, 43.

In August 2021, as the Delta variant of COVID-19 spread rapidly around the world, the Legacy health system began requiring all staff to be vaccinated against the disease. That same month, Washington also instituted a requirement that all healthcare providers be vaccinated. Both vaccination requirements allowed for consideration and accommodation of sincerely held religious beliefs. Defendants have shown through undisputed evidence, however, that the nature of Plaintiffs' positions and work responsibilities in the Legacy health system—requiring close, consistent, and frequent in-person contact with patients and staff—could not be accommodated by a vaccine exemption. Even viewing the facts in the light most favorable to Plaintiffs, such an accommodation would have imposed an undue hardship on Defendants by creating substantial costs in terms of outsize risks to the health of their patients and staff, jeopardizing Defendants' ability to provide healthcare while safeguarding the health of patients and employees.

Because Legacy demonstrates that allowing Plaintiffs to work while unvaccinated posed an undue hardship—and because Plaintiffs fail to provide contradictory evidence—the Court GRANTS summary judgment in favor of Defendants.

## II.   BACKGROUND

The following recitation of the facts is based on evidence in the summary judgment record that is either undisputed or, where material factual disputes exist, taken in the light most favorable to Plaintiffs.

**A.   The Legacy healthcare system and the beginning of the COVID-19 pandemic.**

Legacy is a regional non-profit healthcare system operating eight hospitals and over seventy clinics in Oregon and Washington. *See* Dkt. 12; Dkt. 38 ¶ 4. Legacy has approximately 14,000 employees and 3,000 allied healthcare providers. *Id*. Among these employees were the Plaintiffs, who worked in Legacy facilities in freight and mail distribution (Dkt. 39 at 2–3), as a

physician assistant (Dkt. 36 at 12), as respiratory therapists (*see, e.g.*, *id*. at 162), and as registered nurses in (among other departments) neonatal intensive care and surgery (*see, e.g.*, *id*. at 164, 167, 174). From the onset of the COVID-19 pandemic in early 2020, Legacy had to adapt its facilities and policies, such as suspending elective or nonemergency surgeries, to protect vulnerable patients and staff while treating an influx of COVID-19 patients. *See* Dkt. 38 ¶¶ 4–8.

COVID-19 is an easily transmitted disease, spread primarily through person-to-person contact when an infected individual breathes out respiratory aerosols containing viral particles. Dkt. 36 at 121. The disease is particularly dangerous to elderly and hospitalized individuals with preexisting comorbidities. *See id*. at 120–21.

**B.      COVID-19 safety protocols and limitations**

During the pandemic, Legacy implemented health safety protocols including, among other things, the required use of personal protective equipment (PPE), COVID-19 testing, temperature checks, social distancing, environmental disinfection, and room air changes. *Id*. ¶ 8. Additionally, employees and contractors held daily meetings to discuss health safety and current issues. *Id*. ¶ 9. Legacy also maintained hand hygiene, required self-reporting of illness and symptoms, and sent frequent written updates regarding its workforce and changes in pandemic conditions—including weekly and bi-monthly newsletters sent to staff and leadership, and a weekly update focused specifically on COVID-19 issues. *Id*.

Legacy's non-vaccine protocols had limits. For example, testing could fail to detect COVID-19 until someone had been infected for several days, possibly infecting others in the interim. Dkt. 36 at 128. And PPE could not be worn indefinitely, without interruption, and could be worn improperly. *Id*. And by December 1, 2020, COVID-19-related hospitalizations and deaths had continued to grow to the point where Legacy deployed refrigerated semi-truck trailers as temporary morgues for deceased patients. *See* Dkt. 38 at 27–28.

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 3

C.  **COVID-19 Vaccines**

On December 11, 2020, the United States Food and Drug Administration issued an Emergency Use Authorization for the Pfizer BioNTech COVID-19 vaccine, followed by authorizations for the Moderna vaccine on December 18, and the Johnson & Johnson vaccine in February 2021. *See* Dkt. 36 at 122. The vaccines had been shown in clinical testing, leading up to the emergency authorizations, to be safe and effective in preventing COVID-19 infections and reducing the incidence of severe illness and death from the disease. *Id*. at 122–23. The Pfizer and Moderna vaccines prevented COVID-19 cases in clinical testing participants between 94 and 95 percent of the time. *Id*. Although the vaccines' efficacy at preventing infection waned over time, particularly as the virus continued to mutate, their ability to prevent severe infection, hospitalization, and death remained substantial. *Id.* The vaccines boosted antibody levels, without the need for infection, which in turn reduced the likelihood of transmissibility and symptoms. *Id*. Legacy received its first shipment of the Pfizer vaccines in mid-December 2020. *See* Dkt. 38 ¶¶ 13–14, at 29.

D.  **Legacy's implementation of its COVID-19 vaccination policy and exemptions**

Legacy distributed information on the COVID-19 vaccines promptly after they became available, including via "town halls" and establishing a hotline for vaccine questions. *See* Dkt. 38 ¶¶ 11–12. Legacy administered most of its first shipment of vaccines within a week. *Id*. ¶¶ 13–14. Legacy initially prioritized vaccinating employees who worked in units with high-COVID-19 exposure such as the emergency department and intensive care. *Id*. By March 4, 2021, most of Legacy's more than 17,000 employees, and older patients, were vaccinated. *Id*. ¶ 16. On July 1, 2021, however, approximately 2,240 employees remained unvaccinated. *Id*. ¶ 19.

Between June and September 2021, the spread of the more transmissible and severe Delta variant of COVID-19 led to a 600% increase in hospital admissions and a peak daily death toll of

1,500 Americans. Dkt. 36 at 122–23. By late July, Legacy's own projections modeled an unprecedented increase in COVID-19 cases across its system. *See* Dkt. 38 ¶¶ 16–17, at 43–46. Legacy's leadership team determined that its non-vaccine-based protocols would be insufficient to safeguard staff and patients, many of whom were especially at-risk of illness and death from COVID-19 due to age or existing conditions. *Id*. ¶ 24, 28. After significant consultation with infectious disease experts and leadership in Legacy's human resources, employee health, ethics, operations, compliance and legal departments, Legacy announced on August 5, 2021, that all physicians, credentialed medical staff (directly employed or contracted), nurses, and "any others who conduct business or perform[ed] services within Legacy locations" would need to be fully vaccinated—or have received approval for an exception—by September 30. *Id*. ¶¶ 24–27.

Legacy established a process for reviewing and approving vaccine exception requests, evaluating whether on-site employees could be accommodated with exceptions or could do their jobs without encountering other employees or patients. *Id*. ¶¶ 29–31. COVID-19 transmissions continued to occur during this time and Legacy determined that the hundreds of employees that had requested vaccine exceptions multiplied the risk of death and disease in staff and patients—substantially hindering safe hospital work and care. *See* Dkt. 36 at 123; Dkt. 38 ¶¶ 29–31. Legacy's vaccination policy, however, allowed exemptions based on "narrow, evidence based, bona fide religious and/or medical conflicts with the vaccine[s]." *See* Dkt. 38 at 48 – 50.

E.  **Washington proclamation requiring COVID-19 vaccination**

Occurring almost simultaneously with Legacy's vaccination policy implementation, the State of Washington announced on August 9, 2021, that it was requiring all healthcare providers to be fully vaccinated by October 18. *See* Wash. Proclamation No. 21-14.1(a)–(d) (Aug. 9, 2021). And, similar to Legacy's policy, Washington's proclamation allowed for vaccination exceptions based on "disability-related reasonable accommodation or a sincerely held religious

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 5

belief accommodation" required under the Americans with Disabilities Act, Title VII, or the Washington Law Against Discrimination, but explained that, "as provided in the above-noted laws . . . operators of Health Care Settings are not required to provide accommodations if they would cause undue hardship." *Id.* at 2(a).

F. **Plaintiffs' work responsibilities at Legacy**

Plaintiff Higa was hired by Northwest Acute Care Specialists in September 2018 and was contracted to work as an emergency department physician assistant at Legacy's Salmon Creek Medical Center in Vancouver, Washington. Dkt. 36 at 13, 17. Higa continues to work at Salmon Creek as of this order but was placed on unpaid administrative leave for a brief period of time until he became fully vaccinated. *Id*. at 17, 148–50. Higa's job responsibilities require continuous and close in-person contact with patients and other healthcare providers, including direct physical contact with patients to conduct medical testing and provide care. *Id*. at 14–15.

Similarly, Plaintiff Sweet worked at Salmon Creek as a respiratory therapist since 2015. *See* Dkt. 36 at 162; Dkt. 40-3 at 1. Sweet's responsibilities included "all clinical applications of respiratory care," including working with physicians and other staff to treat patients with direct physical contact—including applying respiratory machines and assisting them with coughing and breathing. *See* Dkt. 36 at 162. Plaintiff Atanassov was also a respiratory therapist at Salmon Creek similarly tasked with, among other things, providing breathing treatments, intubation, coughing assistance, and ventilation set-up. *See id*. at 184, 189.

Plaintiffs Brody, Brici, Hall, Marianu, and Loghry all worked for Legacy as registered nurses in neonatal intensive care, surgery, and preadmission services—all of which required direct, in-person contact with patients. *See, e.g.*, *id*. at 167, 171, 173–174, 177, 179, 193, 199, 206, 209, 215, 219, 223. Neonatal intensive care required close contact with vulnerable newborns, including resuscitation and attendance at high-risk deliveries, and daily patient rounds

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 6

with physicians, other nurses, and other Legacy staff. *See id*. at 167, 219. Work in surgery required directly preparing patients for surgery, operating suction machines and diagnostic equipment during procedures, and preparing and applying wound dressings. *See id*. at 177. Preadmission services required direct contact with patients and staff to manage the flow of medical admissions and answer questions. *See* Dkt. 37 at 2–3.

Plaintiff Williams did not directly interact with or treat patients in his capacity as a distribution technician. However, his job responsibilities required constant movement through the Salmon Creek campus to deliver mail, packages, and equipment. *See* Dkt. 39 at 3. He frequently traveled through hospital spaces shared with medical staff and closely interacted with staff when receiving or delivering parcels at places like nurse's stations. *Id*.

G.      **Plaintiffs' applications for COVID-19 vaccination exemptions**

After Legacy announced its COVID-19 vaccination policy and exemption process, all Plaintiffs applied for exemptions from vaccination. *See* Dkt. 40-1–9. Plaintiffs stated they had religious objections to COVID-19 vaccination including rejection of mandatory vaccination as a violation of bodily integrity (*see* Dkt. 40-3 at 3), objecting to alleged use of "abortion-derived cell lines" in the development of the vaccines (*see, e.g.*, Dkt. 40-4 at 2; Dkt. 40-5 at 3), and opposition to abortion, a belief in "ecological balance," informed consent, and free will. *See* Dkt. 36 at 141–46. Higa also made a complaint to the Civil Rights Division of the Oregon Bureau of Labor and Industries alleging that while Legacy granted him a religious exemption, they failed to "provide a reasonable accommodation" because he was placed on unpaid administrative leave while he was unvaccinated. *See* Dkt. 36 at 107–114. Higa was vaccinated by October 15, 2021, and returned to his normal work duties at Salmon Creek on October 30. *See id*. at 18–19, 148. The other Plaintiffs were removed from their work schedules, placed on administrative leave, and eventually terminated by Legacy. *See* Dkt. 40-1–9.

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 7

### H. Procedural History

Plaintiffs filed separate complaints against Legacy and Northwest Acute Care Specialists which were consolidated by this District into this single proceeding before the Court on July 26, 2023. *See* Dkt. 1, 21, 23. The case was reassigned to the undersigned Judge on August 30. On May 31, 2024, Legacy moved for summary judgment (Dkt. 35) and Plaintiffs opposed (Dkt. 40). On July 10, Northwest Acute Care Specialists also moved for summary judgment. Dkt. 43. The parties have filed all relevant briefing on Defendants' dispositive motions. Dkt. 40, 42, 46–48.

## III. LEGAL STANDARDS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the moving party has the burden of proof at trial (such as a defendant seeking summary judgment based on an affirmative defense) he must demonstrate that no reasonable trier of fact could find against him." *Intelligent Peripheral Devices, Inc. v. SmartPad, Inc.*, No. C95-4479-FMS, 1998 WL 754606, at *2 (N.D. Cal. Oct. 26, 1998) (citing *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)); *see also Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006) (recognizing that a defendant bears the burden of proof at summary judgment with respect to an affirmative defense). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The evidence relied upon at summary judgment must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that

would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.").

Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presume[d]." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). However, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). Consequently, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan,* 497 U.S. at 888 (internal quotations omitted).

**B.      Plaintiffs' Evidentiary Burden at Summary Judgment**

It is the nonmoving party's job "to identify with reasonable particularity the evidence that precludes summary judgment," and if it elects not to do so, the Court need not "scour the record in search of a genuine issue of triable fact[.]" *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citation omitted); *see also Ayers v. Richards*, No. C08-5390 BHS/KLS, 2010 WL 4366069, at *2 (W.D. Wash. Aug. 3, 2010) ("[T]he court need not search for evidence or manufacture arguments for a plaintiff."), *report and recommendation adopted*, No. C08-5390-BHS, 2010 WL 4365555 (W.D. Wash. Oct. 28, 2010); *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("[J]udges are not like pigs, hunting for truffles buried in briefs." (citation omitted)). The Court declines to search the record or piece a case together on Plaintiffs' behalf where they have not cited evidence in support of their arguments. Under the "principle of party

presentation," the Court must presume "parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Coal. on Homelessness v. City & County of San Francisco*, 90 F.4th 975, 979 (9th Cir. 2024) (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 376–77 (2020)).

### C. Accommodation of Religious Beliefs and Undue Hardship Exception

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of" that individual's religion. 42 U.S.C. § 2000e-2(a)(1). An employer must "reasonably accommodate" an employee's religious practice unless such accommodation would impose "undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). Similarly, under the WLAD, employers may not refuse to hire, discharge, bar from employment, or discriminate against in compensation or other terms of employment any person because of their religion. RCW § 49.60.180; *see Kumar v. Gate Gourmet, Inc.*, 325 P.3d 193, 203 (Wash. 2014) (en banc). The WLAD creates a cause of action for failure to reasonably accommodate an employee's religious practices. *Kumar*, 325 P.3d at 203. To prove a WLAD failure-to-accommodate claim, Plaintiffs must show substantially the same elements as a Title VII failure-to-accommodate claim. *See id*. Accordingly, the Court analyzes the state and federal claims together.

To prove a Title VII failure-to-accommodate claim, Plaintiffs "must [show] that (1) [they] had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) [they] informed [their] employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected [them] to an adverse employment action because of [their] inability to fulfill the job requirement." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004). "Once an employee establishes a prima facie case of failure to accommodate religion,

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 10

the burden shifts to the employer to show 'either that it initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship.'" *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1224 (9th Cir. 2023) (quoting *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir. 1998)).

An employer is not required to reasonably accommodate an employee's religious practice if doing so would impose "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). To establish that a particular accommodation would impose undue hardship, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023). Where an employer determines a particular accommodation request would cause undue hardship, the employer must consider alternative accommodation options. *Id.* at 473. Courts must "take[] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Id.* at 470–71 (internal quotations omitted). "What constitutes undue hardship must be determined within the particular factual context of each case." *Balint v. Carson City*, 180 F.3d 1047, 1053–54 (9th Cir. 1999); *see also Groff*, 600 U.S. at 473 (describing undue hardship as a "context-specific standard"). Because Defendants bear the burden of proof to establish an undue burden at trial, to prevail on this defense at summary judgment they must show that "no reasonable trier of fact could find against" them. *Intelligent Peripheral Devices*, 1998 WL 754606, at *2.

### IV.   DISCUSSION

**A.   Legacy establishes undue hardship and Plaintiffs fail to provide contrary evidence.**

Legacy does not challenge the sincerity of Plaintiffs' alleged religious beliefs. *See*

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 11

Dkt. 35 at 21. And for the purposes of this order, the Court assumes without deciding that each Plaintiff could put forward evidence to support the elements of a prima facie case. Legacy instead asserts that Plaintiffs' failure-to-accommodate claims under Title VII and the WLAD fail because exempting Plaintiffs from COVID-19 vaccination, and allowing them to continue to work while unvaccinated in positions where they had direct contact with patients or other healthcare workers, would have imposed undue hardship on Legacy. *Id*.; *see* 42 U.S.C. § 2000e(j); *Groff*, 600 U.S. at 470. An employer establishes undue hardship if an accommodation would result in "substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470–71. "Costs" are not limited to financial expenditures and also encompass an "accommodation's effect on co-workers" which "may have ramifications for the conduct of the employer's business." *Id*. at 472.

In this case, Legacy has provided—with specificity—the limitations of the health and safety protocols in place before the availability of the COVID-19 vaccines (which are the same precautions Plaintiffs assert could have been used to accommodate their religious beliefs and allow them to work while unvaccinated). *See* Dkt. 35 at 21–26; *see supra* Sec. II.B. Plaintiffs do not dispute the self-evident proposition that the "business" of a hospital system such as Legacy includes the ability to protect and uphold the health of its patients and staff. Where, as here, each Plaintiff's work responsibilities required them to frequently interact with—and in many cases make direct physical contact with—elderly, particularly vulnerable, and newborn patients in Legacy's healthcare setting (*see supra* Sec. II.F.) and where COVID-19 is an easily transmissible disease spread by person-to-person contact and aerosolized viral particles from breathing (*see supra* Sec. II.A.), Legacy has demonstrated that allowing certain staff members with increased risk of carrying and spreading COVID-19 to continue close interaction with patients and staff would have "substantial" "ramifications" on its business of providing healthcare. *See Groff*, 600

U.S. at 470–72; *Balint*, 180 F.3d at 1053–54. Numerous district courts have reached similar conclusions. *See, e.g.*, *Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, No. 22-CV-2929 (CS), 2023 WL 3467143, at *2 (S.D.N.Y. May 15, 2023); *Beickert v. New York City Dep't of Educ.*, No. 22-CV-5265(DLI)(VMS), 2023 WL 6214236, at *5 (E.D.N.Y. Sept. 25, 2023); *Bushra v. Main Line Health, Inc.*, No. CV 23-1090, 2023 WL 9005584, at *8 (E.D. Pa. Dec. 28, 2023); *see also Isaac v. Exec. Off. of Health & Hum. Servs.*, No. CV 22-11745-RGS, 2023 WL 8544987, at *2 (D. Mass. Dec. 11, 2023), appeal dismissed, No. 23-2065, 2024 WL 3159284 (1st Cir. Feb. 22, 2024).

When Legacy implemented its COVID-19 vaccination policy, COVID-19 transmission and deaths were at an all-time high. *See* Dkt. 38 ¶¶ 16–17, at 43–46. Hospital admissions, including Legacy's, were at an unprecedented peak. *Id*. Accommodating hundreds of employees refusing vaccination (*see id*. at ¶ 19), who would then pose heightened risks of getting infected and spreading COVID-19 further (*see supra* Sec. II.A.) among Legacy's patient population and staff—in spite of any non-vaccination-based safety protocols (*see supra* Sec. II.B.)—would have imposed substantial costs on Legacy. Legacy would have had to contend with increased risks, transmission, hospitalization, and fatalities from COVID-19 in addition to further incapacitation of its staff. Legacy marshals the specific, unchallenged testimony of epidemiological experts and contemporaneous statistical calculations of risk to prove these contentions at summary judgment. *See, e.g.*, Dkt 36 at 117–39; Dkt. 38 at 43–47.

On the other hand, Plaintiffs—through legal counsel—fail to point with any specificity to evidence from which a jury could reject Legacy's assertions. *See generally* Dkt. 40. For example, Plaintiffs assert that Legacy "has failed to put forth any facts regarding what accommodations [it] considered, and how those accommodations constitute an undue hardship," (*id*. at 3) but ignore the voluminous testimony and other evidence Legacy has provided at summary judgment.

*See supra* Sec. II. Plaintiffs assert that they "need produce very little evidence to overcome an employer's motion for summary judgment" and accordingly only assert their belief that Legacy believed non-vaccination-based safety protocols were a "burden." *See* Dkt. 40 at 8.

Plaintiffs fundamentally mischaracterize Legacy's argument. Legacy does not assert in its undue hardship analysis that non-vaccination-based safety protocols were a burden that would result from accommodating Plaintiffs' vaccine exemption requests; instead, Legacy asserts that, even with those protocols, having unvaccinated staff interacting with patients and other staff throughout its healthcare system was itself the "substantial" cost to its business of providing healthcare and upholding the health of its patients and staff. *See* Dkt. 35 at 21–26; *see, e.g.*, *Groff*, 600 U.S. at 470–72.

Plaintiffs assert that Legacy must "list a single instance where the unvaccinated status of plaintiff employees . . . imposed a risk . . . or where a coworker experienced hardship" such as "a specific instance of transmission" or "dangerous exposures." Dkt. 40 at 11. And Plaintiffs also frame Legacy's non-vaccination-based safety protocols as existing accommodations. *Id*. at 14. However, Plaintiffs do not themselves "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan*, 91 F.3d at 1279. In the face of (1) substantial evidence from Legacy that COVID-19 transmission, illness, and fatalities were at unprecedented levels when the vaccination policy was implemented (*see supra* Sec. II.A.–D.), (2) unchallenged, qualified expert testimony about the mechanics of COVID-19 transmission via close personal contact and how vaccination would reduce that risk (*see* Dkt. 36 at 120–122), and (3) testimony and documentation taken from Plaintiffs themselves that their jobs required the close personal contact conducive to COVID-19 transmission (*see supra* Sec. II.F.), Plaintiffs provide no evidence to the contrary and instead only take umbrage that Legacy did not point to specific instances where Plaintiffs themselves caused COVID-19 transmission. Dkt. 40 at 11.

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 14

The Court need not "scour the record in search of a genuine issue of triable fact," *Keenan*, 91 F.3d at 1279, and it declines to piece together a case on Plaintiffs' behalf where they have not cited evidence in support of their arguments. *See Coal. on Homelessness*, 90 F.4th at 979. The Court must presume "parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Id*. And in this case, Plaintiffs have failed to present any actual evidence that would create a genuine factual dispute about the undue burden imposed on Legacy. *See generally* Dkt. 40. Plaintiffs do not dispute that their jobs required them to work in-person at Legacy facilities and that in-person work presented substantial risks, nor do they dispute that vaccinations would reduce the risks posed to fellow staff or patients. *Id*.

And thus, while the Court "must resolve any factual issues of controversy in favor of the non-moving party," it does so only if "the facts specifically averred by that party contradict facts specifically averred by the movant." *Lujan,* 497 U.S. at 888 (internal quotations omitted). And while the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan*, 572 U.S. at 651 (internal quotations omitted), the Court cannot draw any evidentiary inferences in favor of Plaintiffs when they provide no relevant evidence. Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presume[d]." *Lujan,* 497 U.S. at 889. On the record before the Court, no reasonable jury could find against Legacy's undue hardship defense. The Court therefore grants summary judgment in favor of Legacy as to Plaintiffs' claims of failure-to-accommodate under Title VII and the WLAD.

Separately, Plaintiff Higa asserts that Legacy inadequately accommodated his religious beliefs when it placed him on unpaid administrative leave. *See* Dkt. 40 at 16–17. Legacy contends that Higa's placement on unpaid leave was not an adverse employment action. Dkt. 35

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 15

at 21. It is unnecessary for the Court to address these arguments because given the evidence before the Court, as discussed above, any accommodation that allowed Higa to continue working with patients would have imposed an undue hardship on Legacy.

**B.     Northwest Acute Care Specialists' summary judgment motion is also granted.**

Additionally, Defendant Northwest Acute Care Specialists also move for summary judgment—echoing that the proposed accommodations posed an undue hardship but also asserting that Higa's alleged religious beliefs were not bona fide. *See* Dkt. 43 at 7–12. However, even assuming for the purposes of the motion that Higa's beliefs were sincere, the Court would still grant summary judgment to Defendants because the undue hardship defense applies. *See supra* Sec. IV.A.

### V.     CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motions for summary judgment (Dkt. 35, 43). The Clerk is directed to enter judgment in favor of Defendants and close the case.

Dated this 29th day of August, 2024.

                                                    Tiffany M. Cartwright
                                                    United States District Judge